**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2793-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JERMAINE T. WHARTON,
a/k/a JERMAINE TYRON
WHARTON, JR., and
JARMINE WHARTON,

     Defendant-Appellant.

_____

Argued May 13, 2025 – Decided September 4, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 22-02-0246.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Thomas R. Clark, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Thomas R. Clark, of counsel and on
the brief).

PER CURIAM

Following a jury trial, defendant Jermaine Wharton was convicted of murder, felony murder, carjacking, and related weapons offenses. He was sentenced as a persistent offender to an aggregate extended term of forty-three years in prison, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA).

The charges stemmed from defendant fatally shooting a man during the commission of a carjacking outside of a laundromat in Pleasantville. The victim, Ivan Smith, had driven to the laundromat in his roommate's car. The State's proofs included a series of surveillance videos tracking defendant's movements in the area on the morning of the shooting, his path fleeing the crime scene in the carjacked vehicle, and him renting the stolen vehicle later that morning to a person he encountered on the street.

Law enforcement created a "track flyer" using still shots from the surveillance videos. Defendant's ex-girlfriend and a police officer identified defendant as the person depicted in the track flyer. Officers also recovered a handgun on the side of the road along the suspect's path. Defendant's ex-girlfriend identified the handgun as belonging to defendant, and a ballistics

2

expert testified that the bullet recovered from the victim's body matched a test bullet discharged from the recovered handgun. Defendant maintained his innocence at trial and asserted he was mistakenly identified.

On appeal, defendant raises the following points for our consideration:

POINT I

THE BALLISTICS EXPERT'S TESTIMONY WAS INADMISSIABLE BECAUSE IT WAS DISCLOSED TOO LATE, UNRELIABLE, A NET OPINION, AND A CONFRONTATION CLAUSE VIOLATION.

A. The Late Disclosure Of The Data Underlying The Expert's Opinion Required Exclusion.

B. The Ballistics Expert's Testimony Was An Inadmissible Net Opinion.

C. The Ballistics Expert Could Not Reliably Conclude That The Bullet "Matched" The Gun.

1. Firearms Examination – A Primer

2. The Limits of Reliable Conclusions in Firearm Examination.

D. The State Failed To Establish That The Ballistics Expert Properly Applied A Reliable Methodology.

A-2793-22

E. Testimony That Another Non-Testifying Expert Reached The Same Conclusion Violated The Confrontation Clause.

F. The Improper Admission Of The Ballistics Expert's Testimony Was Harmful Error.

POINT II

THE IMPROPER ADMISSION OF POLICE OPINIONS ABOUT THE CONTENTS OF THE VIDEOS AND STILLS REQUIRES REVERSAL.

POINT III

THE FAILURE TO INSTRUCT THE JURY ON THE TIMING OF THE USE OF FORCE REQUIRES REVERSAL. [NOT RAISED BELOW.]

POINT IV

THE COURT ERRED IN DENYING THE DEFENSE MOTION FOR A WADE[1] HEARING ON THE IDENTIFICATION OF DEFENDANT FROM BLURRY PHOTOS.

POINT V

THE COURT MISUNDERSTOOD THE SENTENCING RANGE AND IMPOSED AN EXCESSIVE SENTENCE.

POINT VI

RESENTENCING IS REQUIRED BECAUSE SENTENCING DEFENDANT TO AN EXTENDED

---

[1] United States v. Wade, 388 U.S. 218 (1967).

TERM AS A PERSISTENT OFFENDER VIOLATED
HIS SIXTH AMENDMENT RIGHTS.  [NOT RAISED
BELOW.]

Having considered the arguments in light of the record and applicable legal principles, we affirm the convictions but vacate the sentence and remand for resentencing.

## I.

We glean these facts from the trial conducted between February 13 and 23, 2023, during which the State produced twenty-four witnesses, consisting of civilian, law enforcement, and expert witnesses.

Megan Bianchi testified that between 8:00 and 9:00 a.m. on November 13, 2021, her roommate, Ivan Smith, woke her to borrow her car to go and do laundry.  Bianchi had a 2011 silver Hyundai Sonata which she loaned to Smith.  Smith went to a laundromat called Ye Old Washaus III located at 914 North Main Steet in Pleasantville.  Smith wore "a gray sweatshirt, dark colored pants, a fitted snapback hat," and "colorful high[-]top shoes."

Just outside, Marie Thenor stood at a bus stop within sight of the laundromat.  She saw two men fighting, one wearing a "gr[ay] jacket" and the other having his "head wrapped up" in something black that was tied in the back.  Thenor testified that during the fight, the men fell to the ground, but only one

5

man got back up—the man with the black head wrap. According to Thenor, the man who got up left the laundromat parking lot in a gray car.

At approximately 9:19 a.m., Pleasantville Police Officer Matthew Stricker was dispatched to the laundromat after "ShotSpotter," a "gun[shot] detection application software," was activated. Stricker found a man with "facial trauma" "[l]ying on his back" on the sidewalk. The man was later identified as Smith. Smith had sustained a single gunshot wound and was pronounced dead at the scene.

An autopsy revealed small abrasions and lacerations, referred to as "powder tattooing" or "stippling," around the central portion of the gunshot wound, indicating that the murder weapon was "anywhere from two inches to [twenty-four] inches" from Smith when it was fired. A bullet was recovered from Smith's body, which was later sent to the New Jersey State Police laboratory for examination.

Tyainna Figaro lived in a housing development called Marina del Rey located across the street from the laundromat. At around 9:00 a.m. on the day of the shooting, Figaro parked her car in the Marina del Rey parking lot. While she, her mother, and her daughter were still inside the vehicle, a "dark[-]skinned" "male" in "dark cloth[ing]" approached the "passenger side

6

door" of her car, attempted to open the door, and claimed that "someone was following him." After his attempt to enter the car failed, the man left and walked "[t]owards the laundromat."

"[N]ot even a minute" later, Figaro "heard gunfire." She called 9-1-1 and went towards the laundromat to see if she could help because she was a nurse. She arrived at the laundromat at the same time as the police and found the victim outside the laundromat "[o]n his back." She gave the police a description of the man who had attempted to enter her car.

Once the police identified the victim, Pleasantville Police Department (PPD) Detective Jeffrey Raine contacted the victim's roommate and learned that he had driven his roommate's Hyundai Sonata that morning. Because Raine did not find the Sonata in the laundromat parking lot, he entered the vehicle into the National Criminal Information Center "as stolen."

Raine then reviewed video surveillance tapes collected from the laundromat and other nearby businesses (the Pleasantville surveillance video). He determined that the Sonata left the rear of the laundromat parking lot at about 9:21 a.m., turned onto Atlantic Avenue, and headed toward Egg Harbor Township. The car was ultimately recovered in Millville. Prior to its recovery, from a series of video surveillance tapes compiled by police (the Millville

surveillance video), at about 11:00 a.m. later that day, a man driving a silver Hyundai Sonata was recorded talking to another man, later identified as Frank Scott, who was walking his dog on Oak Street in Millville.

The driver asked Scott if he knew anyone who wanted to rent the silver car he was driving. Scott testified that he did not know the man prior to this encounter and described him as a "Black" male wearing "[d]ark[-]colored clothing." Scott got into the Sonata with his dog, drove around the corner with the driver, and "talked to a few of [his] friends" to try to help him rent the car to someone. Scott then "got out [of] the car with [his] dog and . . . left."

The driver approached a second man on Oak Street, Damartaun Milledge, and asked if he was interested in renting the Sonata. Milledge testified that Scott made the introduction. Milledge described the driver as "[a] [B]lack guy" wearing "Adidas pants and a blue hoodie." Milledge declined the offer to rent the car but indicated that his little cousin, Quataisa Harrington, was interested. Harrington ultimately rented the Sonata from the driver.

Harrington testified that she was on Oak Street that morning when Scott and the driver pulled up in a silver car and offered to rent the car to her. Harrington described the driver as a "[t]all," "[d]ark[-]skinned" man wearing "[a] blue shirt" and "black pants." According to Harrington, Scott told her that

8

the driver was renting his girlfriend's car for five days while she was on vacation. After she agreed to the rental, the driver gave Harrington the car keys and left on foot.

That night, Harrington and her friend, Nyshawn Mutchersin, drove the car to Atlantic City for the evening. When Harrington and Mutchersin returned from Atlantic City after midnight on November 14, 2021, Mutchersin parked the car on Oak Street in Millville. At about 2:02 a.m. on November 15, 2021, Millville Police Officer Louis Torres located the stolen Sonata on East Oak Street in Millville. Torres "[n]otified dispatch," and the vehicle was secured.

The video surveillance capturing the "car rental" encounters were played for the jury at trial. In the videos, the driver is seen wearing dark pants with a white stripe down the leg. At one point, the driver retrieved a blue hoodie from the trunk of the Sonata and put it on before reentering the car. The driver then exited the car in the same clothing at 11:16 a.m. and walked down the street out of frame. At 11:18 a.m., a man wearing a blue hoodie and black pants with a white stripe is depicted walking down the street.

Raine testified that during the investigation, he reviewed the Millville surveillance video and "took note of the driver of the vehicle, the physical characteristics of the driver and also the clothing description of the driver."

Armed with the information, Raine went back to the Pleasantville surveillance video "to see if [he] could find a person matching or having similar characteristics or clothing . . . as seen in the video from Millville." Raine testified that he found a person matching the description of the driver and tracked the person's movement from an apartment complex in Pleasantville to the laundromat the morning of the murder.

Using still images from the Pleasantville and Millville surveillance videos, Raine created a "track flyer" containing three photographs. Two witnesses, Nadajia Hill and Jordan Corona, later identified the photos in the flyer as defendant. Hill was defendant's ex-girlfriend. She testified that she had an "[o]n and off" two-year relationship with defendant, and lived on South Main Street in Pleasantville in November 2021. In addition to identifying the man in the track flyer photos as defendant, Hill testified that defendant was wearing her black peacoat in the photos and was also wearing the peacoat when he left her home on the morning of November 13, 2021.

Corona, a Newark Police Department detective, testified that in November 2021, while employed with "another government agency," he identified defendant in the "track flyer." Corona stated he recognized defendant because he had observed him twice in the daytime in Pleasantville, in July and August,

10

from a distance of "[twenty] to [thirty] feet." Corona indicated that he was primarily able to identify defendant from the shape of his head, which he described as "elongated," with "the back of his head com[ing] out." Corona was "pretty convinced" that the three photos in the track flyer were all of defendant and promptly contacted the Atlantic County Prosecutor's Office to notify them.

Raine was also able to identify the stolen Sonata and track it "from the laundromat . . . down West Delilah Road in Pleasantville towards Egg Harbor Township." When Raine reported the information to Egg Harbor Township police, he was advised that a gun was found on the side of Delilah Road by two girls. Egg Harbor Township Police Officer Gavin Pullan confirmed that on November 13, 2021, he recovered "a silver Taurus 9[-]millimeter handgun that was on the ground on the side of the road." Hill identified the handgun as defendant's gun, which she had observed up close in her kitchen just two days prior to the murder.

New Jersey State Police Detective Christopher Clayton, a firearm and tool-mark examiner, testified as an expert in firearms and tool-mark identification. Clayton examined the handgun and determined that it was "operable[ and] capable of being discharged." He conducted a "cross-comparison" between the bullet recovered from the victim's body and a test

bullet. Using Association of Firearm and Tool-mark Examiners (AFTE) methodology and analysis, Clayton concluded that the "class characteristics" of the bullets matched. Under "microscopic comparison," Clayton opined that the patterns or tool-marks on the bullets matched. He explained that there was "sufficient agreement of those tool-marks for [him] to render an opinion that th[e] bullet was discharged from this firearm."

At about 12:42 p.m. on November 13, 2021, Millville Police Officer Carlos Vazquez encountered defendant on East Mulberry Street in Millville. The encounter was captured in a body camera recording that was played for the jury. Vasquez testified that defendant was wearing "a black beanie hat, [a] blue Nike sweater, black Adidas sweat[pants] and black Ugg boots."

At trial, the following stipulation was read to the jury:

> The State and [d]efense have stipulated that the clothing . . . defendant was wearing on November 13[], 2021[,] was turned over to a government agency on November 13[], 2021[,] and was then later turned over to the Atlantic County Prosecutor['s] Office on November 30[], 2021. The clothing included the following[:] one, a blue hooded zip up jacket[,] Nike brand. Two, black Adidas pants with white stripes. Three, [a] black face mask. Four, [a] pair of black in color Ugg boots. Five, [a] black in color t-shirt[,] Lee brand. Six, two pairs of socks blue and white in color.

12

On February 10, 2022, defendant was charged in an Atlantic County indictment with first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count one); first-degree purposeful murder, N.J.S.A. 2C:11-3(a)(1) (count two); first-degree carjacking, N.J.S.A. 2C:15-2(a)(1) (count three); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count five). On February 23, 2023, the jury convicted defendant on all five counts. After denying defendant's motion to set aside the verdict and for a new trial, see R. 3:20-1; R. 3:20-2, the trial judge sentenced defendant on March 31, 2023, and entered a memorializing judgment of conviction on May 11, 2023. This appeal followed.

## II.

In Point I, defendant argues the admission of Clayton's testimony that "the bullet that killed Smith came from the gun that allegedly belonged to [defendant]" requires reversal of his convictions for four reasons: (1) the late disclosure of the expert's report in violation of Rule 3:13-3(b)(1)(I) (2021);[2] (2) the violation of the net opinion rule, see Rule 703; (3) the use of an unreliable

---

[2] All citations and quotes to the rule are the version in effect at the time of defendant's trial.

methodology under the <u>Daubert</u>/<u>Olenowski</u>[3] factors to support the expert opinion; and (4) the violation of the Confrontation Clause by asserting that "another non-testifying expert wholly agreed with his conclusions." Defendant asserts that for any of these reasons, the trial judge "erred in denying the defense motions to preclude th[e] testimony, and the improper admission was harmful error." We disagree.

We first address the alleged late disclosure of the expert's report. Defendant argues that the expert's curriculum vitae should have been disclosed no later than thirty days before trial pursuant to <u>Rule</u> 3:13-3(b)(1)(I), and that the expert's lab notes and the two photos of the bullets "should have been disclosed even earlier—when the indictment was returned." Instead, they were disclosed just prior to trial.

"<u>Rule</u> 3:13-3 entitles defendants to broad discovery and imposes an affirmative duty on the State to make timely disclosure of relevant information" on a continuing basis. <u>State v. Smith</u>, 224 N.J. 36, 48 (2016); <u>see</u> <u>State v. Ramirez</u>, 252 N.J. 277, 296 (2022) (describing the "automatic discovery model"). "The State's duty to provide the requisite discovery commences 'upon

---

[3] <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993); <u>State v. Olenowski</u> (<u>Olenowski I</u>), 253 N.J. 133 (2023).

the return or unsealing of the indictment,' R. 3:13-3(b)(1), and continues during the course of a criminal proceeding, R. 3:13-3(f)." State v. Mauro, 476 N.J. Super. 134, 149 (App. Div. 2023) (footnote omitted).

Pertinent to this appeal, Rule 3:13-3(b)(1)(I) (2021) provides:

> Except for good cause shown, the prosecutor's discovery for each defendant named in the indictment shall be provided by the prosecutor's office upon the return or unsealing of the indictment. . . . If any discoverable materials known to the prosecutor have not been supplied, the prosecutor shall also provide defense counsel with a listing of the materials that are missing and explain why they have not been supplied.
>
> . . . .
>
> Discovery shall include exculpatory information or material. It shall also include, but is not limited to, the following relevant material:
>
> . . . .
>
> (I) names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Except as otherwise provided in [R.] 3:10-3, if this information is not furnished [thirty] days in advance of trial, the expert witness may, upon application by the defendant, be barred from testifying at trial.

15

While "[l]ate discovery can cause unfair surprise and raise due process concerns," Smith, 224 N.J. at 48, the rules leave the appropriate response to the sound discretion of the trial court because the appropriate response will depend upon the circumstances presented, see id. at 50-52.  If the State fails to comply with its discovery obligations, "the court 'may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate.'"  Mauro, 476 N.J. Super. at 149 (quoting R. 3:13-3(f)).

In State v. LaBrutto, 114 N.J. 187 (1989), our Supreme Court identified the following factors as weighing against preclusion of expert testimony due to late disclosure:  "(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted and (3) the absence of prejudice which would result from the admission of evidence."  Id. at 205 (quoting Amaru v. Stratton, 209 N.J. Super. 1, 11 (App. Div. 1985)).  In Mauro, we explained that preclusion of testimony for failure to comply with discovery obligations is a "drastic remedy" that "should be applied only after other alternatives are fully explored."  476 N.J. Super. at 149 (quoting State v. Scher, 278 N.J. Super. 249, 272 (App. Div. 1994)).

A-2793-22

"A trial court's resolution of a discovery issue is entitled to substantial deference and will not be overturned absent an abuse of discretion." State v. Stein, 225 N.J. 582, 593 (2016). That said, "we will not defer to discovery orders that are 'well "wide of the mark" or "based on a mistaken understanding of the applicable law."'" Mauro, 476 N.J. Super. at 150 (quoting State v. Hernandez, 225 N.J. 451, 461 (2016)); see id. at 152 (finding no abuse of discretion where the trial court barred evidence "following multiple conferences during which the court repeatedly suggested the parties meet and confer to review discovery, and the prosecutor's repeated failures to disclose evidence or itemize the discovery that had been disclosed in violation of R. 3:13-3(b)(1)"). Moreover, "[u]nless persuaded by a trial court's reasoning, [we] do not defer to the court's interpretation of a court rule." Id. at 150.

Here, pre-trial, defendant moved to bar Clayton's testimony, principally on discovery grounds. On February 13, 2023, in an oral opinion, the judge denied the motion. The judge recounted that Clayton's ballistics report, confirming the operability of the recovered handgun and memorializing that the test bullet and the bullet recovered from the victim matched, was provided to defendant in March 2022. However, the judge noted that "two photographs" of the bullets, lab notes essentially "identif[ying] the weapon," and Clayton's

"three-page CV" were not provided until February 10, 2023, four days before jury selection commenced. In denying defendant's motion to preclude Clayton from testifying as an expert, the judge found no violation of Rule 3:13-3(b)(1)(I) (2021). The judge concluded that "given the totality of the circumstances, there w[as] sufficient information provided to allow . . . defendant to be on notice of the . . . scope of [the expert] opinion."

In support, the judge explained:

> [T]he defense had sufficient opportunity to prepare for[] . . . Clayton's testimony. It is not prejudiced by an introduction of two photographs and one page of notes in the CV. The documents only memorialized the opinion, which was provided to the defense in March of 2022 . . . almost [eleven] months ago . . . .
>
> The defense was provided with sufficient . . . information as to what the opinion would be and that the . . . weapon had been tested and compared.
>
> Here, the defense had an opportunity to physically inspect the weapon and bullets. It had sufficient time to hire an expert and was on notice. And it had . . . extensive . . . notice [of] what . . . Clayton would be testifying to.

The following day, defense counsel informed the judge that he had advised defendant of his right to request a postponement of the trial "to examine [Clayton's] report more closely, perhaps with the aid of an expert." However, according to defense counsel, defendant wished "to proceed [to trial] despite the

18

. . . late discovery." Defendant confirmed his attorney's representation on the record.

We discern no abuse of discretion in the judge's ruling. The State substantially complied with its continuing discovery obligation and the late disclosure did not surprise or prejudice defendant in the preparation of his defense or for trial, particularly since the defense had an opportunity to physically inspect the handgun and bullets eleven months prior to trial. Moreover, defendant waived his objection by confirming that he did not wish to seek a postponement of the trial to either consider the State's belated discovery disclosure or retain his own expert. See Rule 1:7-2 (providing that "[f]or the purpose of reserving questions for review or appeal relating to rulings or orders of the court," "a party, at the time the ruling or order is made or sought, shall make known to the court specifically the action which the party desires the court to take or the party's objection to the action taken and the grounds therefor").

Next, we address the alleged violation of the net opinion rule. Specifically, defendant argues that Clayton produced a "bare-bones report" and failed to explain how he arrived at his conclusions, rendering his testimony an inadmissible net opinion under N.J.R.E. 703. Defendant asserts Clayton failed

to explain to the jury how he reached his conclusion that the bullet retrieved from the victim's body matched the "test" bullet.

We "generally 'defer to a trial court's evidentiary ruling absent an abuse of discretion.'" State v. Burney, 255 N.J. 1, 20 (2023) (quoting State v. Garcia, 245 N.J. 412, 430 (2021)). "'A court abuses its discretion when its "decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Ibid. (quoting State v. Chavies, 247 N.J. 245, 257 (2021)).

N.J.R.E. 702 and 703 together govern the admissibility of expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015). While N.J.R.E. 702 addresses the scope, N.J.R.E. 703 addresses the foundation of the expert testimony, providing that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

"The net opinion rule, a corollary of N.J.R.E. 703, 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Burney, 255 N.J. at 23 (quoting Townsend, 221 N.J.

20

at 53-54); accord Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011). "The rule requires that an expert '"give the why and wherefore" that supports the opinion, "rather than a mere conclusion."'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). As such, "[a] court must ensure that the proffered expert does not offer a mere net opinion." Burney, 255 N.J. at 23 (quoting Pomerantz Paper Corp., 207 N.J. at 372).

The Townsend Court provided the following specific guidance on the subject:

> The net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable. An expert's proposed testimony should not be excluded merely "because it fails to account for some particular condition or fact which the adversary considers relevant." Creanga v. Jardal, 185 N.J. 345, 360 (2005) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)). The expert's failure "to give weight to a factor thought important by an adverse party does not reduce [the expert's] testimony to an inadmissible net opinion if he [or she] otherwise offers sufficient reasons which logically support [an] opinion." Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002) (citing Freeman, 223 N.J. Super. at 115-16). Such omissions may be "a proper 'subject of exploration and cross-examination at a trial.'" Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990), modified on other

21

grounds, 125 N.J. 421 (1991)); see also State v. Harvey, 151 N.J. 117, 277 (1997) (Handler, J., dissenting) ("[A]n expert witness is always subject to searching cross-examination as to the basis of his [or her] opinion." (quoting State v. Martini, 131 N.J. 176, 264 (1993), overruled on other grounds by, State v. Fortin, 178 N.J. 540 (2004))).

[Townsend, 221 N.J. at 54-55 (fourth alteration in original) (citations reformatted) (internal quotation marks omitted).]

Here, Clayton's conclusion that the bullet retrieved from the victim's body came from the abandoned gun was derived from his personal examination and review of the evidence in the case. Clayton testified that he examined the abandoned gun and tested its functionality to determine that it was capable of being fired. He then explained to the jury how a cross-comparison works, including how he evaluated the "class characteristics" of the victim's bullet against a test-fired bullet and was then able to conclude that the two bullets shared the same class characteristics. Similarly, Clayton testified that he conducted a "microscopic comparison" of the two bullets and the scratch marks left on each from the gun's barrel. He explained that the "microscopic imperfections inside that barrel . . . are unique or distinct to that barrel."

Ultimately, Clayton's examination and testing allowed him to conclude that there was "sufficient agreement" between the scratch marks to support his

opinion that the victim's bullet was discharged from the abandoned gun.  Such testimony does not have the hallmark characteristics of a net opinion, but rather is supported by facts, evidence, and photographs.  The testimony was also subject to cross-examination by defendant, and, in turn, acceptance or rejection by the jury.  We therefore discern no abuse of discretion in the judge's rejection of defendant's contention that Clayton's opinion was an inadmissible net opinion.[4]

Next, we address defendant's reliability challenge.  Defendant argues the State failed to demonstrate that Clayton applied reliable methodology to reach his conclusions, rendering his testimony inadmissible under N.J.R.E. 702 and the Daubert/Olenowski standard.  Defendant's attack on Clayton's testimony in this regard is twofold.  First, defendant submits that firearm examination evidence is generally flawed because "there are no standardized guidelines informed by empirical research that define 'sufficient agreement' such that an examiner can identify the firearm that shot a particular bullet."  Second,

---

[4] Although defendant's express objection to Clayton's testimony as a net opinion is not reflected in the record, the judge recited the net opinion standard, and acknowledged that the State's late production of Clayton's notes and photographs insulated his testimony from a net opinion challenge.

23

defendant argues that Clayton's specific report lacks the proper documentation to demonstrate that he reliably applied his methodology.

In State v. Olenowski (Olenowski II), 255 N.J. 529, 580-81 (2023), our Supreme Court announced its unanimous adoption of a hybrid appellate review standard to assess "the bona fides of an expert's methodology" and its application to the case:

> Going forward, we hold that in New Jersey criminal and quasi-criminal cases in which the trial court has admitted or excluded an expert witness based upon Daubert reliability factors, our appellate courts shall review that reliability determination de novo. However, other case-specific determinations about the expert evidence—such as whether the witness has sufficient expertise, whether the evidence can assist the trier of fact in that case, and whether the relevant theory or technique can properly be applied to the facts in issue—should be reviewed for an abuse of discretion.

Thus, all N.J.R.E. 702 challenges to methodology previously considered under Daubert are now reviewed de novo. Specifically referencing ballistics experts, the Olenowski II Court explained that "[i]t would be dysfunctional to have the admissibility of their opinions depend upon how individual trial judges assess the reliability of their methodologies under the Daubert factors, based on varying presentations by varied counsel, and require appellate courts to defer to those varying and potentially conflicting rulings." 255 N.J. at 581. The Court

24

explained that the "stability and fairness of the criminal justice system would be undermined" without standardized de novo review in these matters. Id. at 581-82. However, the trial court continues in its "gatekeeping responsibility" when evaluating the expert's case-specific application of the evidence, which we review for abuse of discretion. Id. at 616.

N.J.R.E. 702 provides the foundation for the admissibility of expert testimony, addressing the qualifications of the expert and the helpfulness of the expertise to the jury as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To satisfy the rule, expert testimony must meet the following criteria:

> (1) the subject matter of the testimony must be beyond the ken of the average juror; (2) the field of inquiry must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the testimony.
>
> [Olenowski I, 253 N.J. at 143 (internal quotation marks omitted) (quoting State v. J.L.G., 234 N.J. 265, 280 (2018)).]

When defendant's trial commenced, our courts still applied the Frye[5] test for assessing the scientific reliability of expert testimony. J.L.G., 234 N.J. at 280. Under the Frye standard, "[s]cientific test results [were] admissible in a criminal trial only when the technique [was] shown to be generally accepted as reliable within the relevant scientific community." State v. Nieves, 476 N.J. Super. 609, 647-48 (App. Div. 2023), certif. granted, 256 N.J. 451 (2024) (first alteration in original) (quoting State v. Cassidy, 235 N.J. 482, 491-92 (2018)). "'That is to say, the test must have a "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the truth."'" Id. at 648 (quoting State v. Pittman, 419 N.J. Super. 584, 592 (App. Div. 2011)).

Our Supreme Court's decision in Olenowski I was issued mid-trial on February 17, 2023, adopting the standard for scientific reliability in criminal cases as set forth in Daubert and rejecting the formerly applied "generally accepted" Frye paradigm. Olenowski I, 253 N.J. at 139. The Daubert standard requires a trial court reviewing a proffer of expert scientific testimony to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

---

[5] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

methodology properly can be applied to the facts in issue." Id. at 147 (emphasis omitted) (quoting Daubert, 509 U.S. at 592-93).

In so holding, Olenowski I outlined four "non-exclusive" factors identified in Daubert to assist the trial court in making the assessment:

> (1) whether the scientific theory or technique can be, or has been, tested; (2) whether it "has been subjected to peer review and publication"; (3) "the known or potential rate of error" as well as the existence of standards governing the operation of the particular scientific technique; and (4) general acceptance in the relevant scientific community.
>
> [Ibid. (quoting Daubert, 509 U.S. at 593-94).]

"The Court emphasized the inquiry is 'a flexible one' and that its 'focus . . . must be solely on principles and methodology, not on the conclusions that they generate.'" Ibid. (quoting Daubert, 509 U.S. at 594-95).

Following a N.J.R.E. 104 hearing to evaluate the admissibility of Clayton's expert testimony, the judge issued an order and oral opinion on February 22, 2023, denying defendant's renewed objection to bar the testimony, now based on Olenowski I's adoption of the Daubert standard.[6] At the outset,

---

[6] Although "the holding in Olenowski[ I] is not retroactive," Nieves, 476 N.J. Super. at 617 n.1 (citing Olenowski I, 253 N.J. at 154), defendant was entitled to its application because Olenowski I was decided while his trial was ongoing.

the judge recounted Clayton's qualifications and the scope of his expertise as follows:

> Clayton is employed by the New Jersey State Police, Detective Sergeant First Class in the ballistics unit. He's been employed by the New Jersey State Police for [eighteen] years. He is a . . . firearm and tool-mark examiner.
>
> Relative to this, his duties include testing firearms, matching bullets to certain firearms through their tool-marks, then the tool-marks that are made by those tools, the tool-marks being lands and channels that are marks on the bullets, which would be created by the . . . tool itself, which is the firearm. As part of his job in . . . being an examiner, he test-fires firearms[ and] determines whether or not they are operable.
>
> He . . . checks the firearms for safety. He checks the firearms for certain characteristics. He also compares discharged bullets from those firearms, . . . and he does all of this to standards which are set forth by the AFTE, AFTE theory of identification, and then its general methodology, which includes the firing, and then also includes microscopic comparisons . . . to evaluate specimens for tool-marks. Now, . . . AFTE is a theory of identification. The general methodology is the procedure by which the theory can be tested.

Next, applying the Daubert factors, the judge first addressed "whether the scientific theory or technique can be or has been tested."

> Here, there are two types—the theory, which is the AFTE theory of identification, also has a methodology for evaluation of a specimen for microscopic

28

evaluation, and then for comparison microscopic evaluation of the . . . bullet.

First, what is taken into . . . account are the class characteristics including the size of the bullet, the twist of the . . . tool or the bullet, the lands and grooves, and other markings that occur when a bullet is discharged from a firearm. . . . [T]here is a specific methodology for what occurs. First, the weapon is tested for operability, does it work or not. Is it . . . safe to fire? The gun is then test-fired, and then there's a report about whether or not it's operable.

Further testing would be to take a . . . discharged bullet and compare it to other bullets, . . . either an unknown bullet or a bullet that is known to have been discharged from the tool. The test standards for how those class characteristics are evaluated, and then through microscopic comparison, which has been a scientific tool for nearly 100 years, . . . they can be compared. And . . . what is observed is a pattern or group of patterns which are sufficiently similar to support that there is a sufficient agreement that each of the . . . bullets was discharged from the same firearm.

. . . Clayton's conclusions, if there is sufficient agreement, are then reviewed blind by another examiner in the New Jersey State Police lab, in which that examiner does not know the results or conclusion of . . . Clayton's evaluation. That's done as a check with the same procedures. So here, whether the scientific theory or technique . . . can be or has been tested, clearly there is a scientific technique in this matter, which can be tested and has been tested.

Next, the judge addressed "whether or not" Clayton's scientific technique was "subjected to peer review and publication" and determined that tool marking

29

and tool comparison had been "reviewed sufficiently and subject to publication." In that regard, the judge credited Clayton's testimony "that from 1970 through 1995, there were multiple studies consistently showing that you can identify a mark to a tool that was used to make it." The judge also acknowledged "peer-review of AFTE" by "their own publications as well as the American Academy of Forensic Science."

Next, in addressing the "rate of error," the judge found that the scientific technique operated with "a less than 1% error rate in the field." Based on Clayton's testimony "that they do make findings of inconclusive or actually dismiss or disregard a firearm as not matching," the judge found no reason "to believe that . . . the error rate [at the New Jersey State Police lab was] anything other than less than 1% in the field."

Lastly, regarding "the existence of standards governing the operation of [the] particular scientific technique" and the general acceptance in the relevant scientific community, based on the totality of Clayton's testimony, the judge concluded that it was "generally accepted that you can match tool-marks to the tool . . . from which they were made, and the scientific portions of the microscopic comparison [were] generally accepted in the community." The judge rejected "the contrary studies" offered by defendant to challenge the

30

reliability of the scientific technique, noting that they could be "utilized on cross-examination."

Likewise, in rejecting defendant's arguments regarding subjectivity, the judge explained:

> The defense arguments about the subjectivity inherent in otherwise reliable methodologies go to the weight of the evidence and not the admissibility. These are concerns that are best addressed by cross-examination. Expert testimony is still testimony. It's not irrefutable fact, and [its] persuasive powers [are] for the jury to decide.
>
> In fact, the jury charge for expert testimony specifically indicates that the jury is not bound . . . "by such expert's opinion . . . ."

Cognizant of our standard of review, we are convinced the judge correctly applied the Daubert factors and properly determined that Clayton's testimony satisfied each element. We affirm the judge's ruling admitting Clayton's expert testimony substantially for the reasons articulated by the judge.

Defendant maintains that Clayton's testimony was unreliable under the Daubert factors because his firearm examination conducted pursuant to the AFTE methodology was flawed in general. In support, he asserts that because individual "microscopic comparison" does not present a "standard or protocol[ that] dictates how many characteristics the examiner must find in agreement to

31

declare a match," without more objective standards in place, each examiner is left free to set the criteria based on individualized training and experience. Defendant concedes that our courts have used this type of firearm matching testimony for decades. Nonetheless, he asserts it "has far outstripped what is scientifically reliable," contributing to the judge's error in permitting Clayton's testimony. Defendant further contends that Clayton's report lacks the proper documentation to demonstrate that he reliably applied the AFTE methodology.

We reject defendant's contentions out of hand. We have acknowledged that "[t]he science of firearm and tool[-]mark identification is well-established, spanning over 100 years in the United States." State v. Ghigliotty, 463 N.J. Super. 355, 362 (App. Div. 2020). Thus, "tool[-]mark analysis is not a newcomer to the courtroom." State v. McGuire, 419 N.J. Super. 88, 130 (App. Div. 2011). Indeed, "[b]ecause of their uniqueness, a firearm's individual characteristics make firearm identification possible, so long as the toolmarks imparted are 'reproducible for comparisons.'" Ghigliotty, 463 N.J. Super. at 362 (quoting Robert M. Thompson, Nat'l Dist. Att'ies Ass'n, Firearm Identification in the Forensic Science Laboratory 7-9 (2010)).

> "For the science of toolmark identification, the underlying hypothesis is that a toolmark can be identified to a specific tool that produced it, to the practical exclusion of all other tools." Thompson, at

9-10. Although it is impossible to prove the hypothesis "by testing all tools ever produced in the world," firearms examiners make identifications "based on observation and experimentation" which includes the consideration of "'known non-match'" toolmark comparisons. Thompson, at 10.

. . . "There is a foundation of knowledge about firearm and tool[-]mark identification that has been organized over time and is described in forensic textbooks, scientific literature, reference material, training manuals, and peer reviewed scientific journals." Id. at 28-29. The [AFTE], an international body of practitioners, is the largest professional organization in the field and publishes a professional journal concerning firearm and toolmark science. Id. at 11, 29.

Neither the underlying principles nor the methodology has changed significantly during the last 100 years. Id. at 8. The AFTE recognizes that the "most widely accepted method used in conducting a toolmark examination is a side-by-side, microscopic comparison of the markings on a questioned material item to known source marks imparted by a tool." President's Council of Advisors on Sci. and Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods, 104 (2016). A firearms toolmark examiner uses a comparison microscope to compare toolmarks on an evidence bullet with toolmarks present on a test[-]fired bullet from the suspected weapon that is linked to either the crime scene or a suspect. Thompson, at 10, 27. Class characteristics are evaluated first, followed by individual characteristics. Id. at 26-27; Comm. on Identifying the Needs of the Forensic Scis. Cmty., Nat'l Rsch. Council, Strengthening Forensic Science in the United States: A Path Forward, 152-53 (2009);

33

President's Council of Advisors on Sci. and Tech., at 11, 104.

. . . .

When an examiner finds that the toolmarks on an evidence bullet and a test bullet fired from the suspected weapon are in "sufficient agreement," a firearm identification can be made. Thompson, at 9-10, 26. "[T]he final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images." Comm. on Identifying the Needs of the Forensic Scis. Cmty., at 153.

In 1992, the AFTE adopted a "Theory of Identification" and standardized the terms and conclusions that firearms examiners should use to describe examination results. Revised in 2011, the Theory of Identification recognizes that identification is "subjective in nature" and defines and explains the "sufficient agreement" standard used by examiners[. Thompson, at 11.]

. . . .

Based on its Theory of Identification, the AFTE developed four potential conclusions for examiners to make following an investigation: (1) identification; (2) inconclusive; (3) elimination; and (4) unsuitable, meaning that the evidence was not suited for examination. Id. at 11-12.

. . . .

As of 2010, the error rate in actual casework had not been studied or determined. Id. at 29. However, "reviews of proficiency testing data show[ed] that the

34

error rate for misidentifications for firearm evidence is approximately 1.0%, and for toolmark evidence it is approximately 1.3%." Ibid. An individual examiner's error rate should be considered in each case. Ibid.

[Ghigliotty, 463 N.J. Super. at 362-65 (third alteration in original) (emphasis added) (citations omitted and reformatted).]

Here, the record amply supports the admission of Clayton's testimony. Contrary to defendant's argument, Clayton credibly testified that the AFTE method of identification can be tested. Clayton explained:

Yes. It can be tested. So, the basic premise of what we do is, we're looking at tool-marks. We're evaluating tool-marks, and we're trying to determine if that tool-mark was made by a specific tool. For me as a firearms examiner, firearms identification falls under tool-mark identification in the sense that a firearm is a tool, no different than a hammer, a cutting tool, a screwdriver, in the sense that a harder object is going to mark a softer object that it comes in contact with.

The softer objects that a gun comes into contact with would be a bullet going down the steel barrel of a firearm. A harder object, that barrel, is marking the softer object, the bullet, the projectile. The other object that it's going to come in contact with in [sic] a firearm is that discharge cartridge case. Again, there's microscopic imperfections inside that gun from the manufacturing process. It's going to mark that softer cartridge case . . . with tool-marks.

There[ have] been numerous studies that have been done, starting back in 1970, [by] Monte Lutz . . . . He took two barrels that were consecutive to the

manufacturer and put them on revolvers, and he was able to discharge bullets from those two barrels, . . . which were consecutively manufactured, and you're able to identify which bullet came out of which barrel. And that's the whole premise, that tool-marks can be identified back to the source that they came from, because of those individual imperfections inside either the barrel of the firearm or the chamber, or other parts of the firearm.

From 1970 to 1995, there have been eight other empirical studies of consecutively-made manufactured barrels, barrels that are made one by the other, and you can consistently identify tool-marks back to the source that it came from. Since '95, there[ have] been numerous other studies, whether it's consecutive-manufactured barrels or slides or cartridge cases, other tool-marks where you can consistently identify a tool-mark back to the source that it came from.

Equally unavailing is defendant's contention that the State failed to present studies supporting the error rates. On the contrary, Clayton testified that "[s]ince 1993, there have been [twenty-five] error rate studies that have been published." Clayton also explained the prevailing error rate and described the maintenance standards within the unit. As to the error rate studies, he testified:

[The studies] include examiners of different experience, some with a lot of experience, some who are new, different types of ammunition, different types of firearms, different types of models. And it's consistently across the board with these error rate[] studies, it's approximately 1% or less than 1%. The most recent studies that have come out within the last several years, there's the Baldwin study, the Jamie

36

Smith study, the Keisler study, [and the Federal Bureau of Investigation] Aim study, [and with] all these error rate[] studies, which include examiners, it's consistently low, approximately 1%, less than 1% error rate.

Regarding the maintenance standards, he explained:

[W]e have standards within our unit, specifically to . . . prevent error. We do the best that we can to prevent error. Each examiner, I myself, we get yearly proficiency testing. So, whether it's through . . . Collaborative Testing Standards, or in-house testing, . . . each examiner goes through yearly proficiency testing. In our training, before you do your own examinations, you go through a proficiency test.

Also, anytime we do microscopic comparison work, bullets or shells, our work is also reviewed microscopically by another examiner who doesn't know the results or conclusions of our results. They do it blind. And again, that's just another way to ensure that we're not putting out errors. Also, one of . . . our standards and controls that we have within the unit, we take detailed notes when we do our comparisons, and we also take photomicrographs of our conclusions. And this is all in an attempt to reduce the possibility that we put an error out, or a misidentification out.[7]

Clayton also addressed the general acceptance of the AFTE method of identification, stating that "we all use that same methodology when we're talking

---

7    Contrary to defendant's claim of inadequate supporting documentation, Clayton added that there was "administrative and technical review" of "every report" produced by the unit to ensure that all conclusions "are supported or documented by either notes or photomicrographs."

A-2793-22

about comparison work."  Clayton explained the robust history of its general acceptance as follows:

> In our field, doing the microscopic comparison work, it's been around since the mid-1920s.  You had the Sacco-Vanzetti trial, St. Valentine's Day Massacre, even when you had the John F. Kennedy [a]ssassination.  You were able to match those bullets back to the particular firearm, Lee Harvey Oswald's rifle.  So, doing this comparison work in our field has been around for almost a century.  But as long as you're following, if you're properly trained, following AFTE methodology, utilizing that theory of identification, . . . it's a sound scientific standard that we adhere to.

As the judge pointed out, defendant's arguments go to the weight and credibility of Clayton's testimony, not its admissibility.  However, as our Supreme Court stressed, the focus is on the "principles and methodology, not on the conclusions that they generate."  Olenowski I, 253 N.J. at 147 (quoting Daubert, 509 U.S. at 595).  Here, the principles and methodology are clearly sound.

Next, we turn to defendant's Confrontation Clause challenge.  Defendant argues that his "right to confrontation was violated because Clayton impermissibly and repeatedly told the jury that another ballistics examiner came to the exact same conclusion as him," constituting inadmissible hearsay. Because defendant raises this issue for the first time on appeal, we review for

38

plain error and determine if the alleged error is "clearly capable of producing an unjust result." State v. Montalvo, 229 N.J. 300, 320-21 (2017) (quoting R. 2:10-2); see State v. Reeds, 197 N.J. 280, 298 (2009) ("[W]hen counsel fails to object to offensive testimony, we . . . apply the plain error standard of review . . . .").

"The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). Instead, plain error "is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (citation omitted) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Indeed, our Supreme Court has "cautioned that 'rerun[ning] a trial when the error could easily have been cured on request[ ] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Singh, 245 N.J. 1, 13 (2021) (alterations in original) (quoting Santamaria, 236 N.J. at 404-05). Thus, "[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" Id. at 13-14 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468

(2018)).  Further, the burden is on the defendant to show plain error.  State v. Weston, 222 N.J. 277, 295 (2015).

"The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee that, in a criminal trial, the accused has the right 'to be confronted with the witnesses against him [or her].'"  State v. Williams, 219 N.J. 89, 98 (2014).  To that end, "[t]he Confrontation Clause 'prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony.'"  Ibid. (second alteration in original) (emphasis omitted) (quoting State in the Int. of J.A., 195 N.J. 324, 342 (2008)).

Nonetheless,

> [t]he right of confrontation, like other constitutional rights, may be waived by the accused. The Constitution does not compel a criminal defendant to insist that the State call a live witness who might do damage to his [or her] case. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 328 (2009) ("It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis.").  Defense counsel, many times as a matter of trial strategy, will refrain from objecting to hearsay that may inure to the advantage of the defendant.  Because counsel and the defendant know their case and their defenses, they are in the best position to make the tactical decision whether to raise a Confrontation Clause objection.  See United States v. Moon, 512 F.3d

40

359, 361 (7th Cir.) ("That it may be to defendants' advantage to accept the hearsay version of evidence makes it problematic to entertain a Crawford[8] claim via the plain-error [standard] . . . ."), cert. denied, 555 U.S. 812 (2008); State v. Nyhammer, 197 N.J. 383, 413-14 (finding no Confrontation Clause violation where defendant chose "strategic course" not to cross-examine victim about accusations in videotaped interview), cert. denied, 558 U.S. 831 (2009).

It therefore makes perfect sense that "[t]he defendant always has the burden of raising [a] Confrontation Clause objection." Melendez-Diaz, 557 U.S. at 327; see also United States v. Maxwell, 724 F.3d 724, 728 (7th Cir. 2013) ("[T]he strategic decision to demand live testimony is the defendant's choice to make, and one that many defendants . . . opt to forego— sometimes for good reasons."). It is the defendant's choice "to assert (or forfeit by silence) [the] Confrontation Clause right." Melendez-Diaz, 557 U.S. at 326.

[Williams, 219 N.J. at 98-99 (omissions and fourth, fifth, and seventh alterations in original) (emphasis omitted) (citations reformatted).]

In Williams, defense counsel declined to object when the State offered a forensic pathologist to testify on behalf of another pathologist's autopsy report. Id. at 100-01. Accordingly, the expert was permitted to testify that through his review of the other expert's report who performed the autopsy, he "was able to reach independent conclusions about both the manner and cause of" death. Id.

---

8 Crawford v. Washington, 541 U.S. 36, 51 (2004).

A-2793-22

at 96. The Court held that the defendant's failure to object constituted a waiver of his right to confrontation and was perhaps attributable to defense strategy, or, at a minimum, barred by the invited error doctrine. Id. at 99-101. The Court therefore "decline[d] to address the merits of [the] defendant's Confrontation Clause arguments." Id. at 101. Applying those principles, we reach the same conclusion here and decline to address the merits of defendant's Confrontation Clause claim.[9]

### III.

In Point II, defendant argues that the judge improperly permitted "lay opinion testimony from two police witnesses" in violation of N.J.R.E. 701 when Raine opined that the surveillance videos all showed the same person and Corona opined that the person in the videos was defendant. Invoking violations of his right to due process and a fair trial, defendant claims that admission of these highly prejudicial lay opinions warrant reversal of his convictions because Raine impermissibly narrated content of the surveillance videos and Corona had

---

[9] In any event, "[a]t present, our case law permits . . . a single, or even substitute, witness to testify and explain the results of an out-of-court data analysis, when the individual can 'provide the independent "verification of the data and results."'" State v. Carrion, 249 N.J. 253, 271 (2021) (quoting State v. Bass, 224 N.J. 285, 319 (2016)).

A-2793-22

insufficient prior encounters or familiarity with defendant to permit the identification.

Lay opinion testimony is admissible subject to two conditions set forth in N.J.R.E 701. First, the lay witness's opinion must be "rationally based on the witness' perception;" second, the opinion must "assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. To satisfy the first condition, the "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting LaBrutto, 114 N.J. at 197). The second condition limits lay testimony only to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 469 (quoting Singh, 245 N.J. at 15); see also State v. Higgs, 253 N.J. 333, 363 (2023) (same). The second condition therefore precludes "lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'" Sanchez, 247 N.J. at 469-70 (alteration in original) (quoting State v. McLean, 205 N.J. 438, 459 (2011)).

Our Supreme Court has considered how our case law has applied N.J.R.E. 701 to law enforcement officers narrating video recordings or identifying the

defendant as the individual depicted in a photograph or video relating to the offense charged:

> In State v. Lazo, we excluded the opinion testimony of a law enforcement officer unacquainted with a defendant who stated that he included a photo of the defendant in a photo array "[b]ecause of his similarities to the suspects that were described by the victim." 209 N.J. 9, 19 (2012) (alteration in original). We held that "[n]either a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Id. at 24.
>
> In Singh, however, we affirmed the admission of an arresting officer's lay opinion that the sneakers worn by the suspect in surveillance video looked similar to sneakers worn by the defendant at the time of his arrest, given the officer's direct observation of the defendant's sneakers. 245 N.J. at 17-18. We held in Singh that the officer's reference to the suspect in the video as "the defendant" was improper in light of the dispute about the identity of the suspect, but that the reference was "fleeting" and did not amount to plain error. Ibid.
>
> In Sanchez, we reversed the trial court's exclusion of the defendant's parole officer's identification of the defendant in a photograph taken from surveillance video, given the parole officer's many in-person meetings with the defendant and the capacity of her identification testimony to assist the jury. 247 N.J. at 469-75. There, the parole officer's identification derived from her personal perception, which enabled her to identify the defendant in the surveillance photograph "more accurately than a jury could." Id. at 474.

A-2793-22

. . . .

In <u>Higgs</u>, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm. 253 N.J. at 365-67. Applying N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior interaction or familiarity with either defendant or the firearm in question" and that "[h]is testimony was based entirely on his lay opinion from watching the video." <u>Id.</u> at 366. We reasoned that "[t]he video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they saw on screen, without the influence of opinion testimony by an officer who was not there at the time." <u>Id.</u> at 367. We held that the officer's testimony had invaded the jury's province. <u>Id.</u> at 366-67. We did not, however, "rule out the possibility of allowing a law enforcement officer to testify about a sequence in a video that is complex or particularly difficult to perceive." <u>Id.</u> at 367.

In <u>State v. Watson</u>, . . . we addressed the admissibility of a police officer's narration of a video of a bank robbery at which the officer was not present, and held that the narration exceeded the bounds of proper lay opinion testimony under N.J.R.E. 701 and N.J.R.E. 602 when the officer provided commentary about the suspect's actions during the robbery. <u>Watson</u>, 254 N.J. 558, 606-08 (2023). We disapproved of portions of the officer's narration testimony that reflected his subjective belief of what occurred in the surveillance video, including observations about alleged efforts by the suspect not to touch surfaces during the robbery and a comment that "the suspect was very careful in . . . not attempting to leave any type of evidence behind." <u>Id.</u> at 608.

45

[State v. Allen, 254 N.J. 530, 544-46 (2023) (alterations and last omission in original) (citations reformatted).]

After reviewing other jurisdictions' handling of the subject, in Watson, the Court held that "Rules 701, 602, and 403 provide a framework for the admission of narration evidence" by "a witness who did not observe events in real time." Watson, 254 N.J. at 600, 602. The Court instructed:

> [W]hether narration evidence is helpful turns on the facts of each case. Rule 701's helpfulness prong can be satisfied when an investigator draws attention to key details that might be missed, or helps jurors follow potentially confusing, complex, or unclear videos that may otherwise be difficult to grasp. Counsel may offer other reasons to allow limited narration testimony, which courts should evaluate with care.
>
> Narration testimony must also comply with N.J.R.E. 403. The rule guards against the risk of "[u]ndue prejudice, confusion of issues, . . . misleading the jury, . . . [and] needless presentation of cumulative evidence." Placing appropriate limits on narration testimony can help avoid those problems.
>
> [Watson, 254 N.J. at 602 (omissions and last two alterations in original).]

The Court held that such testimony "must accord with specific limits." Ibid. First, "continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording" must be avoided. Id. at 603. Second, investigators may "describe what appears on a recording but may not

46

offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations." Ibid. "Third, investigators may not offer their views on factual issues that are reasonably disputed," as "[t]hose issues are for the jury to decide." Ibid. Finally, while "lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence. That type of comment is appropriate only for closing argument." Id. at 604. The Court explained that, "[c]onsistent with those principles, an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear[s] in different frames, which a jury might otherwise overlook," if those issues are not in dispute. Ibid.

Applying these principles, we are satisfied that both Raine and Corona testified consistently with the governing case law and we discern no abuse of discretion in the judge permitting the testimony. As to Corona, following a N.J.R.E. 104 hearing, the parties agreed that because Corona's prior encounters with defendant were law enforcement-related contacts, the jury should be shielded from the nature of those encounters to avoid prejudice. The judge summarized the agreement, stating "[t]he idea here is to prevent [the testimony]

from being anything that would . . . present[] to the jury that there were adverse contacts between [defendant] and law enforcement before [the shooting] and that[ those contacts were] how he was identified."  In accordance with the agreement, Corona testified before the jury that he worked for a "government agency" when he encountered the defendant, that he observed him in Pleasantville two separate times for about thirty seconds each during the daytime, and that he later identified defendant in a track flyer that was attempting to identify an individual shown in three photos.  Corona never provided unduly prejudicial testimony by, for example, telling the jury that he had previously seen pictures of defendant's "mugshot" "on multiple occasions."

Defendant now argues that the prior encounters were not as substantial as those presented in Sanchez but instead track more closely to the facts of Singh. Defendant also argues that because defendant's ex-girlfriend identified defendant on the surveillance video, Corona's testimony was not helpful to the jury and improperly bolstered Hill's identification.  Although the facts in Sanchez showed a more robust relationship prior to the identification, a robust relationship is not required by N.J.R.E. 701 or case law.  See Sanchez, 247 N.J. at 469-73 (discussing a range of factors relevant to determining the admissibility of a law enforcement officer's identification of the defendant under N.J.R.E.

701, including the witness's prior familiarity with the defendant, the defendant's change in appearance since the alleged offense, the availability of identification testimony from other witnesses, and the quality of the video recording at issue).

Additionally, Corona's testimony was helpful to the jury because it placed defendant in Pleasantville in the months prior to the murder. Further, Hill's credibility was challenged when counsel revealed to the jury that she had a criminal record and was on probation.

We also find no fault in the admission of Raine's narration testimony. Defendant argues that Raine improperly offered his opinion about the video content, including identifying physical characteristics of the driver and the stolen vehicle, providing a description of the clothing worn by the "individual" in the videos, and concluding that the videos tracked the same person and the same vehicle. Defendant asserts that Raine's commentary regarding the "individual" and "the vehicle" he was tracking was a "critical link" to demonstrate that the person in the laundromat video was the same person identified by Hill and Corona in the track flyer.

During his testimony, among other things, Raine introduced video evidence from thirty locations in three towns. Thirty-six surveillance video clips were played for the jury. Raine also described the compilation of the track flyer

from stills taken from the videos. Based on our thorough review of the record, we are satisfied that Raine provided objective, factual descriptions of what was depicted in the videos and the stills in accordance with the dictates of Watson, 254 N.J. at 602-04. Critically, Raine consistently used neutral language to describe the individual in the videos as "a person" or "the individual." Additionally, Raine never said the "person" in Pleasantville was the same person driving the stolen vehicle, or referred to the "person" in the video as defendant, as deemed improper in Singh, 245 N.J. at 17-18.

IV.

In Point III, defendant argues that the judge erred in failing to instruct the jury on the timing of the use of force in connection with the carjacking charge, given the State's theory that defendant shot the victim to steal his car. Specifically, defendant asserts the judge was required to instruct the jury that "defendant must form an intent to steal before or contemporaneously with his use of force." According to defendant, the omission requires reversal of both the carjacking and related felony murder convictions.

Our jurisprudence governing appropriate jury charges is well settled.

> "Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). The court must "explain the controlling legal principles and the questions the jury is to decide."

State v. Martin, 119 N.J. 2, 15 (1990). Instructions demand careful attention and "must provide a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Montalvo, 229 N.J. at 320 (citations and internal quotation marks omitted). Proper instruction is so critical that "erroneous instructions on material points are presumed to be reversible error." Martin, 119 N.J. at 15.

[State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (citations reformatted).]

In assessing the adequacy of a jury instruction, "[t]he charge must be read as a whole" to determine its overall effect. State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). In so doing, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law" with respect to the relevant issue. State v. Baum, 224 N.J. 147, 159 (2016) (omission in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"Nevertheless, 'not every failure to do so is fatal.'" State v. Tierney, 356 N.J. Super. 468, 482 (App. Div. 2003) (quoting State v. Bilek, 308 N.J. Super. 1, 10 (App. Div. 1998)); see, e.g. State v. Morton, 155 N.J. 383, 422 (1998) (explaining that the trial court properly charged the jury because "the facts were not so complex or confusing as to require an intricate discussion in the charge");

State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999) (holding that "the charge given, as a whole, was consistent with the factual theories advanced by the parties"). In addition, the purported error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Because defendant failed to object during trial and raises this issue for the first time on appeal, we again review for plain error. See R. 2:10-2; State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2."). Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207).

"Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting Jordan, 147 N.J. at 422-23). Still, if a defendant does not object when a charge

is given, as here, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Montalvo, 229 N.J. at 320 (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

To evaluate the jury charge, we must first examine the elements of the offense at issue. N.J.S.A. 2C:15-2(a)(1) defines carjacking as follows:

> A person is guilty of carjacking if in the course of committing an unlawful taking of a motor vehicle . . . or in an attempt to commit an unlawful taking of a motor vehicle [the person]:
>
> > (1) inflicts bodily injury or uses force upon an occupant or person in possession or control of a motor vehicle[.]
> >
> > . . . .
> >
> > An act shall be deemed to be "in the course of committing an unlawful taking of a motor vehicle" if it occurs during an attempt to commit the unlawful taking of a motor vehicle or during an immediate flight after the attempt or commission.

In instructing the jury on the elements of carjacking, the judge substantially tracked the Model Jury Charges. See Model Jury Charges (Criminal), "Carjacking (N.J.S.A. 2C:15-2)" (rev. June 13, 2005). Although model jury charges "are not binding authority," State v. Bryant, 419 N.J. Super. 15, 28 (App. Div. 2011), "a jury charge is presumed to be proper when it tracks

the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough,'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)); see also R.B., 183 N.J. at 325 (instructing trial courts to follow the model jury charges and read them "in their entirety to the jury"); State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) ("When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000))).

Defendant relies on State v. Lopez, 187 N.J. 91, 101 (2006), to support his argument that the judge erred in failing to provide instructions on the timing of the use of force when delivering the carjacking instruction. In Lopez, our Supreme Court considered "whether N.J.S.A. 2C:15-1(a) encompasses so-called 'afterthought' robbery—the situation in which a defendant does not formulate the intent to steal until after force is used." 187 N.J. at 93. The parties presented varying interpretations of the robbery statute, with the State urging the Court to accept that the robbery statute should be read broadly to include afterthought robbery. Id. at 99-101. The Court rejected the State's interpretation, concluding that "N.J.S.A. 2C:15-1(a) does not encompass afterthought robbery." Id. at 93.

The Court explained:

[O]ur statute requires that the threats or violence be carried out in furtherance of the intention to commit a theft. Indeed, the sequence of events is critical; the intention to steal must precede or be coterminous with the use of force. That is why a person who has stolen goods and thereafter uses violence in flight is guilty of robbery—the intention to commit the theft generated the violence. That model simply does not work where a violent fracas occurs for reasons other than theft, and the perpetrator later happens to take property from the victim. In the former example, the theft is the reason for the violence and a robbery has occurred. In the latter, the violence and the theft are unconnected, and the perpetrator is guilty of assault and theft but not of robbery.

[Id. at 101.]

Defendant suggests that the Lopez reasoning should apply with equal force to the carjacking instruction because the jury could have concluded from the testimony that the fight in the laundromat parking lot led to the theft of the car—which is not carjacking—rather than the car theft generating the fight—which is carjacking. We are unpersuaded by defendant's argument.

Although we previously acknowledged that the carjacking statute "mirrors" the robbery statute, "[t]he carjacking statute creates a new kind of robbery that is punishable more severely than robbery under N.J.S.A. 2C:15-1, with the specified added element in the carjacking statute of the taking of a

A-2793-22

motor vehicle under the circumstances specified in the statute." State v. Garretson, 313 N.J. Super. 348, 355-56 (App. Div. 1998).

> The available legislative history demonstrates the obvious intent of the Legislature in the enactment of this statute to combat increased violent acts of aggression in the taking of occupied motor vehicles from their occupants. See Press Release, Off. of the Governor, Governor Signs Law Toughening Penalties for Carjacking (Aug. 4, 1993).
>
> Our review of the statute and its history persuades us that the Legislature intended to make carjacking an all-encompassing offense whenever a vehicle was taken from its occupant or driven off with the occupant in it. Our understanding of the statute is furthered by reference to then Governor Florio's [p]ress [r]elease, which is instructive, because it reflects his view of the applicability of this statute whenever a perpetrator seizes or takes over a vehicle from the actual possession of its owner or occupant. In his [p]ress [r]elease when he signed the carjacking statute into law the Governor was quoted as saying[,] "Any thug who yanks open a car door and tries to grab the wheel will go to jail. Count on it[ .] . . ." Such releases by the Governor may appropriately be considered as part of the legislative history of the enactment.
>
> [Garretson, 313 N.J. Super. at 357-358 (italicization omitted) (footnotes omitted) (citation reformatted).]

We are convinced that neither the carjacking statute, the legislative history, prevailing caselaw, nor the Model Jury Charge support the need for the timing language suggested by defendant. First, the statutory language broadly

56

includes an act taken "'in the course of committing an unlawful taking of a motor vehicle' if it occurs during an attempt to commit the unlawful taking of a motor vehicle or during an immediate flight after the attempt or commission." N.J.S.A. 2C:15-2(a). This language does not suggest that the jury was required to pinpoint when defendant firmed up his intention to steal the car. Simply put, if injury is inflicted or force is used during an attempt to steal a vehicle, it is a carjacking. N.J.S.A. 2C:15-2(a). Here we have just that—a fatal shooting followed by the theft of the victim's car. We reject defendant's wordplay as well as the concept of an afterthought carjacking.

Defendant's argument also ignores the fact that the State adduced ample proof of defendant's conduct prior to the murder and carjacking that evinced his intent. Through Figaro's testimony, the State demonstrated defendant's intent to steal a car prior to Smith's murder. Figaro testified that moments before the shooting, a "dark[-]skinned" male in dark clothing approached the passenger side of her car, attempted to open the door, and claimed that "someone was following him." Figaro testified that after defendant was unsuccessful in gaining access to her car, he walked toward the laundromat. Moments later, she heard gunfire. Figaro's testimony was unchallenged, and the jury was free to accept that defendant was the same man who approached Figaro.

57

Conversely, there were no facts presented to the jury to support defendant's counter-theory of a fight between Smith and defendant that turned into an afterthought car theft. In fact, the eyewitness account of the events provided by Thenor confirmed the elements of a carjacking. From her bus stop, Thenor watched two men fighting until they fell to the ground. According to Thenor, only one man got up and drove away in the car. We therefore discern no error in the charge as given and no basis to intervene.

V.

In Point IV, defendant argues that the judge erred in denying his motion for a pretrial <u>Wade</u>/<u>Henderson</u>[10] hearing to explore the reliability of his ex-girlfriend's identification from blurry photos extracted from a surveillance video. He argues that Hill was only able to identify him in the photos after the police engaged in suggestive investigatory acts a week-and-a-half after the shooting. He urges that the investigative procedure was "inherently suggestive because it was a show-up."

Pre-trial, defendant moved for a <u>Wade</u>/<u>Henderson</u> hearing to challenge the reliability of Hill's identification and assess impermissible suggestiveness from

---

[10] <u>State v. Henderson</u>, 208 N.J. 208 (2011).

A-2793-22

the interviews conducted prior to the identification. Following oral argument, the judge issued an order and written opinion on December 28, 2022,[11] denying defendant's request for an evidentiary hearing and ruling that Hill's identification was admissible. In the opinion, the judge recounted that Hill was interviewed by detectives on November 24, 2021. Hill advised the detectives that she had been in a relationship with defendant since the end of 2019 but had not seen defendant since the day of the murder. Hill described what defendant was wearing when she last saw him and was shown a photograph, which she identified as defendant. Hill was also shown photographs from the surveillance video from the scene of the shooting and identified the male in the photographs as defendant. Hill stated defendant was wearing the same clothing she had last seen him wearing.

The judge determined defendant could not meet the "threshold burden of providing some evidence of impermissible suggestiveness" to warrant a hearing. The judge explained that "[m]ere speculation about whether there was a pre-interview interview that occurred that might have been suggestive [was] insufficient based on the totality of circumstances herein." According to the

_____

[11] The judge also rendered an oral opinion on the record on December 23, 2022. The oral opinion mirrored the written opinion.

A-2793-22

judge, "[t]hat speculation does not satisfy . . . [d]efendant's burden and does not support the granting of an evidentiary hearing."

The judge continued:

> Here, . . . [d]efendant concedes that there is a recording of . . . Hill's statement that was provided to him in discovery. There has been no proffer, argument, or evidence substantiating that there had been a pre-interview interview that was impermissibly suggestive or in any other way violative of . . . [d]efendant's [c]onstitutional rights. This was not a show-up. It was a confirmatory identification. As someone who had been in an intimate relationship with . . . [d]efendant for nearly two years leading up to the instant incident, . . . Hill could not only easily recognize him by his appearance, but could provide significant details about his clothing, tattoos, behavior, and other confirmatory information. Under such circumstances, the facts that . . . Hill may have been shown a photograph of . . . [d]efendant, which was unrelated to the instant offenses and from which she identified her boyfriend, . . . [d]efendant, and that that may have occurred prior to her reviewing photos from the surveillance footage, did not transform this confirmatory identification into a show-up. There is no evidence that such investigatory actions were impermissibly suggestive relative to her identification of . . . [d]efendant. The fact that . . . Hill was interviewed by law enforcement in their vehicle, from which she was free to leave at any time, does not substantiate a claim that she was coerced into identifying . . . [d]efendant. As contemplated in [State v. Pressley, 232 N.J. 587, 592-93 (2018)], her confirmatory identification is not considered suggestive. The facts surrounding the identification by . . . Hill of . . . [d]efendant go much further than th[ose] contemplated in Pressley, in which the Court provided

60

> for a neighbor, or an acquaintance only known by a street name[,] as examples of confirmatory identifications. Given their intimate relationship, . . . Hill's identification of . . . [d]efendant is even more reliable than what is permitted under Pressley.

We agree with the judge's ruling and affirm substantially for the reasons articulated by the judge.

To be entitled to a Wade/Henderson hearing, a defendant must first proffer "some evidence of suggestiveness" that could result in a misidentification. Henderson, 208 N.J. at 238, 288. "As the Supreme Court explained, 'reliability is the linchpin in determining the admissibility of identification testimony.'" Id. at 238 (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). In Pressley, our Supreme Court addressed how the risk of misidentification is tempered when the identification is a confirmatory identification. 232 N.J. at 590-93. The Court explained that "[p]olice will, on occasion, display a single photograph to a witness in an effort to confirm the identity of a perpetrator," which is "typically limit[ed] . . . to situations in which the perpetrator is previously known to or acquainted with the witness." Id. at 593 (quoting Nat'l Rsch. Council, Identifying the Culprit: Assessing Eyewitness Identification, 28 (2014)). Thus, "[a] confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name," or can "only [identify] by

a street name." Id. at 592-93. Critically, "a 'confirmatory' identification . . . is not considered suggestive." Id. at 592.

"[W]e are mindful that the trial court's findings at the hearing on the admissibility of identification evidence are 'entitled to very considerable weight.'" Adams, 194 N.J. at 203 (quoting State v. Farrow, 61 N.J. 434, 451 (1972)). That said, "the trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings." Ibid.

Here, the judge's ruling is amply supported by the record. See People v. Reuben, 626 N.Y.S.2d 251, 252-53 (N.Y. App. Div. 1995) (finding a girlfriend's familiarity with the defendant to create a confirmatory identification and no need for a Wade hearing). We therefore reject defendant's arguments challenging the quality of the photo, the way Hill was questioned, and any perceived lack of instructions from the police that she should not feel compelled to identify him.

VI.

Defendant's remaining Points both address his sentence. In Point V, defendant argues that the judge "misunderstood the sentencing range and imposed an excessive" forty-three-year NERA sentence for murder. He contends the judge erred in accepting "the State's argument that only an

extended-term sentence could be imposed." Defendant also argues that the judge "double-count[ed]" his prior record of conviction when using it as a basis to find him eligible for an extended-term and as a factor to increase the length of his sentence.

In Point VI, as supplemented by his additional citation letter submitted pursuant to Rule 2:6-11(d), defendant argues that under our recent decision in State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), "the imposition of a persistent-offender extended-term sentence violated his Fifth and Sixth Amendment rights." Defendant asserts that, "as in Carlton, that extended-term must be vacated and remanded for a jury to make the required findings or for the State to forego pursuing the extended term." Because this latter issue is dispositive, we address it first.

Carlton comes on the heels of Erlinger v. United States, in which the United States Supreme Court held that "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his [or her] exposure to punishment." 602 U.S. 821, 828 (2024). The Supreme Court further stated that "[v]irtually 'any fact' that "'increase[s] the prescribed range of penalties to which a criminal defendant is exposed"' must be resolved by a unanimous jury beyond a

reasonable doubt (or freely admitted in a guilty plea)."  Id. at 834 (second

alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490

(2000)).

Under N.J.S.A. 2C:44-3(a), upon application of the prosecuting attorney,

a person may be sentenced to an extended term of imprisonment if the individual

"has been convicted of a crime of the first, second or third degree and is a

persistent offender."  The statute defines a "persistent offender" as:

> [A] person who at the time of the commission of the
> crime is [twenty-one] years of age or over, who has
> been previously convicted on at least two separate
> occasions of two crimes, committed at different times,
> when he [or she] was at least [eighteen] years of age, if
> the latest in time of these crimes or the date of the
> defendant's last release from confinement, whichever is
> later, is within [ten] years of the date of the crime for
> which the defendant is being sentenced.
>
> [Ibid.]

In Carlton, we acknowledged that Erlinger abrogates the rule that allowed

a sentencing court to determine the factual predicates for eligibility for enhanced

sentencing under the persistent offender statute.  480 N.J. Super. at 325-26.  We

held that "a unanimous jury must find beyond a reasonable doubt that all five of

the above-enumerated factual predicates are present, or the defendant must

A-2793-22

admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." Id. at 328-29.

We further concluded that application of the holding in Erlinger to the persistent offender statute, N.J.S.A. 2C:44-3, applies retroactively to pipeline cases. Carlton, 480 N.J. Super. at 317; see also Griffith v. Kentucky, 479 U.S. 314, 328 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

We also rejected the State's argument that the harmless constitutional error doctrine applies to the pipeline cases to which Erlinger is retroactively applied. Carlton, 480 N.J. Super. at 329-38. We based that holding on "the Erlinger majority's unambiguous rejection of the notion that overwhelming evidence obviates the need to have a jury make the decision" that the elements of an extended-term statute have been met. Id. at 336. We see no reason to depart from that holding here.

On the State's application, the judge found defendant qualified for sentencing as "a persistent offender" under N.J.S.A. 2C:44-3(a) based on his

criminal history which included a 2014 Delaware conviction "for drug dealing"[12] and a 2021 New Jersey conviction for "possession of a handgun without . . . a permit." After appropriate mergers, the judge sentenced defendant to a discretionary extended term of forty-three years in prison, subject to NERA, on count two, and a concurrent fifteen-year term of imprisonment, subject to NERA, on count three. In support, the judge found aggravating factors three, six, and nine based on the "substantial risk" of re-offense, defendant's significant criminal history,[13] and the "need" for deterrence. See N.J.S.A. 2C:44-1(a)(3), (6), (9). The judge found no mitigating factors and concluded that "the aggravating factors prepondera[ted] over the lack of any mitigating factors."

Affording Erlinger pipeline retroactivity to defendant's direct appeal of his sentence, we vacate defendant's extended-term sentence and remand for resentencing consistent with Erlinger and Carlton. If the State seeks to impose an extended-term sentence on remand, the court shall, in the absence of a knowing waiver of defendant's right to a jury trial, hold a jury trial on the murder

---

[12] "A conviction in another jurisdiction can support a discretionary imposition of an extended term." State v. Copeman, 197 N.J. Super. 261, 265 (App. Div. 1984) (citing N.J.S.A. 2C:44-3(a) and N.J.S.A. 2C:44-4(c)).

[13] The judge pointed out that defendant also had seven prior "misdemeanors or disorderly persons offenses" in Delaware and New Jersey, consisting of assaultive, drug, and weapons possession-related charges.

charge limited to the question of whether defendant is a persistent offender. See N.J.S.A. 2C:44-3(a). The State shall have the burden of proving, beyond a reasonable doubt, the required persistent offender elements.

Because the extended-term sentence is integral to the overall sentence, we need not address defendant's remaining sentencing arguments other than to point out that in State v. Tillery, our Supreme Court held that there was "no error in the trial court's reliance on defendant's criminal record both to determine defendant's 'persistent offender' status under N.J.S.A. 2C:44-3(a), and to support the court's finding of aggravating factors three, six, and nine." 238 N.J. 293, 327 (2019); see also State v. McDuffie, 450 N.J. Super. 554, 576 (App. Div. 2017) (rejecting "as lacking merit" the defendant's claim that the court "impermissibly double-counted his criminal record, when granting the State's motion for a discretionary extended term, and again, when imposing aggravating factor six, which considers the extent and seriousness of a defendant's prior record").

Further, once the determination is made that defendant meets the statutory eligibility criteria for persistent-offender status for sentencing to an extended term,

> the range of sentences, available for imposition, starts
> at the minimum of the ordinary-term range and ends at

A-2793-22

the maximum of the extended-term range. By recognizing that the top of the extended-term range is the "top" applicable to a persistent offender, we do not make mandatory a defendant's sentencing within the enhanced range. Rather, we merely acknowledge that the permissible range has expanded so that it reaches from the bottom of the original-term range to the top of the extended-term range. Where, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court—subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found. On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire range.

[State v. Pierce, 188 N.J. 155, 169-70 (2006).]

In sum, we affirm defendant's convictions, vacate his extended-term sentence, and remand for further proceedings, to include resentencing.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2793-22